


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA * CRIMINAL NO. 14-118

v. * SECTION: "J" (1)

MARINE MANAGERS LTD. *

* * *

**FACTUAL BASIS**

The United States, represented by the United States Attorney's Office for the Eastern District of Louisiana and the Environmental Crimes Section of the Department of Justice, and the defendant **MARINE MANAGERS LTD.** ("Defendant"), hereby agree that this Factual Basis (1) a true and accurate statement of the Defendant's criminal conduct committed through the actions of its agents and employees; (2) that it provides a sufficient basis for the Defendant's plea of guilty to the charges contained in the Bill of Information in the above-captioned matter and as set forth in the plea agreement signed this same day; and (3) the following facts would be established beyond a reasonable doubt through competent evidence and testimony had this matter proceeded to trial.

Since July 2011 and continuing to present, defendant **MARINE MANAGERS LTD.**, a Liberian corporation with a corporate office at 1, Skouze Street, 185 35 Piraeus, Greece, was the operator of the *Motor Vessel ("M/V") Trident Navigator,* that transported bulk cargo between various ports and places in the world, including the Port of New Orleans and other locations in the Eastern District of Louisiana.

The *M/V Trident Navigator* was a 38,802 gross ton ocean-going bulk carrier cargo ship built in 2000. The *M/V Trident Navigator* was approximately 225 meters in length, was registered in the Marshall Islands, and had an International Maritime Organization (IMO)

number of 9206073. Defendant operated the *M/V Trident Navigator* through its agents and employees on the vessel including the ship's Master, Chief Engineer, Second Engineer, Electrician, Fitter and three employees known as Oilers and Wipers.

The 1973 International Convention for the Prevention of Pollution From Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution From Ships, 1973, are commonly referred to as the "MARPOL Protocol" or "MARPOL 73/78." The MARPOL Protocol established the international standard that discharges of bilge waste must contain less than fifteen parts per million oil ("15 ppm"). The Act to Prevent Pollution from Ships ("APPS"), makes it a crime to knowingly violate the MARPOL Protocol or a series of similar regulations promulgated pursuant to APPS. Under the APPS regulations, each oil tanker of 150 gross tons or more or non-tanker vessel of more than 400 gross tons must maintain a record known as an Oil Record Book ("ORB"). Entries must be made in the ORB for certain engine room operations including the disposal of oil residue or the discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces. All accidental, emergency or other exceptional discharges of bilge waste or oil must be recorded in the ORB along with the reason for the discharge. Each of these engine room operations is required to be fully recorded without delay in the ORB. The entries are to be signed by the person or persons in charge of the operation and each completed page must be signed by the Captain of the ship. These regulations apply to foreign-flagged ships when they are in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States. The U.S. Coast Guard ("Coast Guard") regularly inspects the ORB during port state inspections to determine compliance with U.S. law and the MARPOL Protocol.

Pursuant to MARPOL and APPS, oil-contaminated wastes may be discharged overboard into the ocean only if they contain 15 ppm or less concentration of oil. The principal technology utilized to lower the oil content of oil-contaminated waste is an Oil Water Separator ("OWS"), which includes an Oil Content Monitor ("OCM") to detect and prevent concentrations of oil in excess of 15 ppm from being discharged overboard.

The following factual statements are based upon the expected testimony of Coast Guard personnel, and the Master, Second Engineer, Third Engineer, Electrician, Fitter and three laborer-level employees known as Oilers and Wipers. As of the execution of this Factual Basis, the Chief Engineer has denied the allegations contained herein. On or about December 28, 2013, while the M/V Trident Navigator was sailing in the Mediterranean Sea, the Chief Engineer instructed the Second Engineer to construct a bypass system that could be connected between the vessel's bilge pump and overboard discharge valve. The bypass, often referred to as a "magic pipe", consisted of several feet of clear flexible hose and two steel flanges. The purpose of the bypass was to discharge the contents of the ship's bilge tank directly into the sea, circumventing the ship's Oil Water Separator and Oil Content Monitor. The Second Engineer constructed the bypass system as instructed.

On or about December 31, 2013, the Chief Engineer ordered the Second Engineer to hook up the "magic pipe" and to discharge several metric tons of oily bilge waste from the bilge tank directly into the sea. The Second Engineer followed the order and installed the "magic pipe". During the afternoon on or about December 31, 2013, the vessel's Fitter took a photograph of the installed "magic pipe" with his cell phone. The Chief Engineer noticed the Fitter doing this and chased him around the engine room. Once the Chief Engineer caught up with the Fitter, he took the cell phone from the Fitter and ordered the Oiler to delete the

photograph taken of the "magic pipe" that was on the Fitter's phone. While the Oiler was deleting the photograph, the Fitter informed the Master of the vessel that there was illegal activity happening in the engine room and that the Chief Engineer had taken his cell phone. When questioned by the Master, the Chief Engineer denied any illegal activity took place. After several hours, the cell phone was returned to the Fitter without the photograph he took of the "magic pipe". The "magic pipe" was removed after the discharge was completed and stored in the vessel's Steering Room. The discharge was not recorded in the vessel's Oil Record Book as required.

On or about January 18, 2014, the vessel was boarded by the U.S. Coast Guard ("Coast Guard") while it was anchored in the Mississippi River, near New Orleans, Louisiana, and within the Eastern District of Louisiana. During the Coast Guard inspection, an Oiler handed a note to a Coast Guard inspector that contained some details about the location of the "magic pipe" and how it was hooked up. Coast Guard inspectors discovered the "magic pipe" in the Steering Room and took the hose to the area near the Oil Water Separator, bilge pump, and overboard discharge pipe. While the inspectors were trying to determine where the hose could be connected to, the Chief Engineer cut the hose nearly in half and declared that there was no oil in the hose. Throughout the inspection, the Chief Engineer declared that he did not know what the hose was used for and suggested that perhaps it was used to transfer fresh water during the vessel's last visit to drydock. Oil sample testing of the ends of the hose and from the middle of the hose all confirmed the presence of slightly degraded fuel and lubrication oils.

Also on or about January 18, 2014, Coast Guard inspectors interviewed several engineroom personnel including two Oilers, a Wiper, and a Fitter. Prior to each of those interviews, the Chief Engineer instructed each of the crewmembers to deny having any

knowledge of what the "magic pipe" was used for. Even though the Chief Engineer knew the Coast Guard inspectors were trying to ascertain whether the hose had been used to illegally discharge oily bilge waste, the Chief Engineer kept in his cabin a roll of alarm tapes from the engine control room that would help the Coast Guard determine if the OWS had been used. In addition, the Chief Engineer initially denied that the vessel had a Sounding Log, but eventually produced after repeated requests from Coast Guard inspectors. The Sounding Log is a daily record of liquid levels of tanks in the engine room, including the bilge tank.

There is no evidence that shoreside based managers of defendant **MARINE MANAGERS LTD.** were informed of the activities on the vessel during December 28-31, 2013, or of the alleged actions of the Chief Engineer during the Coast Guard investigation in January 2014. The actions of the crewmembers on the vessel were contrary to defendant **MARINE MANAGERS LTD.'s** written policies and procedures, however, defendant **MARINE MANAGERS LTD.** accepts that it is vicariously liable for their actions.

KENNETH E. NELSON
Trial Attorney
Environmental Crimes Section

6-27-14
Date

GREGORY M. KENNEDY
Assistant United States Attorney

6-27-14
Date

DANIEL A. TADROS, ESQ.
Attorney for Marine Managers Ltd.

6/27/14
Date

MARINE MANAGERS LTD.
Defendant

6/27/14
Date